UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY SCHEIN, INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>JENNIFER COOK,<br><br>   Defendant. | Case No. 16-cv-03166-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: ECF No. 2 |

  Before the Court is Plaintiff Henry Schein, Inc.'s ("HSI") Motion for a Preliminary Injunction against Defendant and former HSI employee Jennifer Cook. ECF No. 2. This Court previously granted HSI's application for a temporary restraining order (TRO), on June 10, 2016, ECF No. 12, and now considers whether to grant an injunction on the same or similar terms. Cook has opposed the motion, ECF No. 15, and the Court has heard oral argument on the matter, ECF No. 17.

  The Court will grant the motion in part and deny it in part.

**I. BACKGROUND**

  **A. Plaintiff's Allegations**

  According to Plaintiff's allegations, Plaintiff HSI "is in the business of marketing, distributing, and selling medical, dental and veterinary supplies and equipment, and other healthcare products, to medical, dental, and veterinary practitioners, and other healthcare professionals and organizations." ECF No. 2-3 ¶ 2. Defendant Cook was hired as a "Field Sales Consultant" with HSI in April 2005, and entered into a Confidentiality and Non-Solicitation Agreement in 2005, as well as a Letter Agreement in 2011 that required her to hold "in strictest confidence" any confidential information "concerning the products, processes, services, business, suppliers, and customers of HSI," and to "neither copy nor take any such material upon leaving

1  Company's employ." ECF No. 2-1 at 9-10.  It also stated that upon her separation from HSI, and
2  for twelve months thereafter, Cook may not "solicit the patronage of any past or then-current
3  customer of the Company." ECF No. 1 at 24.  Cook resigned from HSI on May 13, 2016, and
4  began working for one of HSI's competitors, Patterson Dental ("Patterson"). Id. at 7, 11.

5        Plaintiff alleges that prior to leaving HSI, Cook "began to loot HSI's confidential,
6  proprietary, and trade secret documents and information with the apparent goal of diverting HSI's
7  customers."  On May 10, Cook forwarded from her work email account, to her personal email,
8  "several comprehensive, confidential HSI customer practice reports that were produced using
9  HSI's proprietary software," which all "contained a wide array of confidential and trade secret
10 information." Id. at 11.  On May 12, 2016, the day before she resigned, Cook forwarded
11 "numerous additional customer-related reports, including an equipment inventory report, price
12 quotations for prospective customers, and equipment proposals on which HSI was working." Id.
13 On May 13, Cook "logged into HSI's system with HSI's proprietary 'FSC' computer program,"
14 which "had the effect of 'updating' onto Cook's laptop, substantial, specific, customer related
15 sales and ordering data from the HSI computer system." Id.  She then failed to return her laptop to
16 HSI for two weeks. Id.  On May 14, the day after she resigned, Cook "unlawfully accessed the
17 HSI computer system, this time using a web-based 'iPad app' and her company credentials." Id.
18 This type of access "would enable Cook to obtain on her iPad, large amounts of ordering and
19 purchase data for each of the HSI customers that had been assigned to her." Id.

20       Cook also attempted to erase the e-mails that she sent from her HSI computer. Id. at 12.
21 Before her resignation, Cook "also attempted to divert HSI customers to Patterson," and "visited
22 the offices of certain HSI customers, deleted the HSI product ordering icon from their computer
23 systems and destroyed HSI catalogues and business cards." Id.

24       On June 9, 2016, the same day HSI applied for a TRO, Plaintiff filed a complaint alleging
25 eight causes of action: (1) Misappropriation of Trade Secrets Under the Defend Trade Secrets Act
26 (DTSA), 18 U.S.C. § 1836, et seq.; (2) Misappropriation of Trade Secrets Under the California
27 Uniform Trade Secrets Act (CUTSA), Cal. Civ. Code § 3426, et seq.; (3) Breach of Fiduciary
28 Duty and Duty of Loyalty; (4) Breach of Written Contract; (5) Breach of Implied Covenant of

1  Good Faith and Fair Dealing; (6) Tortious Interference with Prospective Economic Advantage;
2  (7) Violation of California Unfair Competition Law (UCL); (8) Violation of California Penal Code
3  § 502.  ECF No. 1.  Plaintiff also filed a declaration stating it attempted service of the complaint
4  and application for TRO by e-mailing a copy to Cook's personal e-mail address and causing
5  copies to be hand-delivered to Cook's last known home address.  ECF No. 2-4.

### B. Issuance of TRO and Defendant's Allegations

On June 10, 2016, this Court granted in part HSI's application for a TRO.  ECF No. 12.  It granted Plaintiff's request for a TRO requiring Defendant to "preserve all documents, data, tangible things, and other materials relating to this case," and to refrain from "altering, destroying, or disposing of any evidence or other materials, in any form, relating to this action."  Id. at 8-9.  It also granted Plaintiff's request to enjoin Defendant from "directly or indirectly accessing, using, disclosing, or making available" any of HSI's confidential documents, data or information, "directly or indirectly violating or interfering with the confidentiality obligations" signed with Plaintiff, and "directly or indirectly, soliciting, continuing to solicit, initiating contact with, or accepting business from, any HSI customers whose accounts were assigned to her while she was employed by HSI."  Id.  It denied Plaintiff's further request for early discovery.  Id.  Finally, the order set a hearing and briefing schedule to consider Plaintiff's motion for a preliminary injunction.  Id.

Defendant filed an opposition to the motion for preliminary injunction.  ECF No. 15.  She states that she was recruited to HSI from a previous distributer of dental and medical equipment, and that HSI "instructed Ms. Cook to bring her clients with her and to send her clients' account ordering histories . . . to help her clients make the transition."  ECF No. 15 at 7.  She also states that "[a]s competitors in the dental supply industry, HSI and Patterson sell to many of the same clients, primarily dental practices and laboratories," that "[b]oth companies provide the same or similar products manufactured by the same companies," and that "nearly all dental practices purchase merchandise, equipment and technical support from more than one company simultaneously."  Id.  "In fact, Ms. Cook estimates that the majority of her clients at HSI also placed orders with Patterson."  Id.

1    Cook contests many of Plaintiff's factual assertions regarding her conduct. She states that
2    many of the documents and much of the information asserted by HSI as trade secrets are in fact
3    "generally available" through HSI's website or through its distribution of that information to
4    clients. Id. at 8. She also states that she "did not intend to access HSI's systems" through her iPad
5    and "does not believe that she accessed the system." She also states that while she did visit the
6    offices of some of her HSI customers on behalf of Patterson, as alleged by HSI, she only did so
7    after her resignation, and never removed any HSI documents or ordering icons, but merely
8    informed them that she was now with Patterson and hoped for their business. Id. at 14-15.
9    Finally, Cook states that as a sales representative, her compensation is "commission-
10   based," and therefore she has "worked hard to expand her client base." Id. at 9. "But because the
11   TRO precludes Ms. Cook from communicating with any of her previous clients, including those
12   with whom she worked prior to HSI, her entire career and livelihood is in jeopardy." Id. at 15.
13   Cook states that during the eight days that the TRO was in effect, she was "contacted by at least
14   twenty clients on multiple occasions who were inquiring into, among other things, previously-
15   placed orders, why she has failed to show up for regularly scheduled visits with her clients
16   recently, requests for assistance in placing new orders for supplies and equipment, and her general
17   well-being." Id. Because she complied with the TRO, she ignored these inquiries, "each time
18   risking alienating valued and longstanding clients and tarnishing her sterling reputation for
19   excellent customer service." Id.

## II.    LEGAL STANDARD

Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. Id. at 20. "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

Preliminary relief may take two forms: it may be prohibitory or mandatory in nature. "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 878 (9th Cir. 2009) (internal alterations and quotation marks omitted). A mandatory injunction orders a party to take action. Id. at 879. Because mandatory injunctions do more than preserve the status quo, they are "particularly disfavored," the Ninth Circuit has observed that "courts should be extremely cautious about issuing a preliminary injunction" in those circumstances. Martin v. Int'l Olympic Committee, 740 F.2d 670, 675 (9th Cir. 1984).

Due to the exigent nature of a preliminary injunction, a court may consider hearsay and other evidence that would otherwise be inadmissible at trial.[1] See Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); see also Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

## III.  DISCUSSION

The Court's prior order granted a TRO based on the Court's conclusion that Plaintiff had demonstrated a likelihood of irreparable injury and a likelihood of success on the merits; that the balance of equities tips in its favor; and that the public interest would be served by the issuance of a TRO. ECF No. 12. Addressing these same factors again after considering Defendant's opposition and the parties' arguments, the Court concludes that Plaintiff is entitled to a preliminary injunction prohibiting Defendant from accessing or otherwise using the alleged trade secrets that she e-mailed to herself and downloaded. The Court find, however, that Plaintiff is not entitled to an injunction preventing Defendant from contacting or doing business with former or current HSI customers.

---

[1] Defendant has submitted a set of evidentiary objections to Plaintiff's declaration filed in support of its motion for a preliminary injunction. ECF No. 16. In light of the relevant case law, the Court will decline to strike Plaintiff's declaration, and instead consider Defendant's objections as arguments as to why Plaintiff's declaration should be given less weight.

### A. Likelihood of Success on the Merits

In its prior order, the Court concluded that Plaintiff was likely to succeed on its trade secret claims, brought under the DTSA, CUTSA, and UCL, among others, because "customer information such as sales history and customer needs and preferences constitute trade secrets." ECF No. 12 at 5. It also concluded that Plaintiff was likely to succeed on its breach of contract claims, both in relation to Defendant's alleged breach of her agreement to keep information confidential and her agreement to avoid soliciting HSI customers upon termination with the company. ECF No. 12 at 5.

#### 1. Trade Secrets

Under the DTSA, a trade secret is information for which:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C.A. § 1839(3). Similarly, a trade secret under CUTSA is defined as information that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

Here, Plaintiff has argued that the customer information at issue was developed by HSI and kept confidential in order to give HSI an advantage over its competitors in obtaining business from those customers. Under California law, this type of information is protectable as a trade secret. See Courtesy Temporary Service, Inc. v. Camacho, 222 Cal. App. 3d 1278, 1288 (1990) (finding that sophisticated customer information, such as "billing rates, key contacts, specialized requirements and markup rates" constitutes a trade secret); Richmond Techs., Inc. v. Aumtech Bus. Sols., No. 11-CV-02460-LHK, 2011 WL 2607158, at *19 (N.D. Cal. July 1, 2011) (identifying relevant California law). Further, Plaintiff has argued that it has taken measures to

keep this information secret, such as requiring employees to sign confidentiality agreements and allowing access only through password-protected programs and entry points. ECF No. 2-3 ("Showgren Declaration") ¶ 14; see also Pyro Spectaculars N., Inc. v. Souza, 861 F. Supp. 2d 1079, 1090 (E.D. Cal. 2012) (finding that use of confidentiality agreements and password protection of company databases constitutes reasonable efforts to maintain secrecy).

Cook argues that the documents, data, and information referenced by HSI are not trade secrets because they can be "readily ascertained through public sources and/or [are] generally known in the industry." ECF No. 15 at 18. She contends that the identity of HSI's customers is "widely known in the dental industry" and that "sales representatives in the dental industry generally know which dental practices purchase their merchandise and equipment from which dental supply companies and who their supply representative is." Id. at 18-19. She also contends that the identity of Bay Area dental practices generally "is similarly widely known and is readily available through a simple online search via Google, Yelp, or 1-800-Dentist, and the like." Id. Similarly, Cook contends that HSI inventory numbers and pricing information are both available on its public website. Id. at 19-20.

Cook's response fails to address some of the key facts HSI alleges regarding these materials, which extend beyond lists of customers and dental practices in the area, or inventory numbers and prices. HSI's allegations relate to information specific to HSI's own history with its customers, including "information related to HSI's customers, products, margins, profit percentages, credit profiles, preferences and markets." ECF No. 2-1 at 11. It further notes that this information was created using "proprietary HSI software" that "allowed Cook to access and produce reports containing or analyzing this customer information, as well as derivative information, such as buying patterns, customer needs and preferences, marketing and pricing strategies for customers." Id.; see also Showgren Declaration ¶ 10. Cook does not effectively refute these allegations.

For this reason, Am. Paper & Packaging Products, Inc. v. Kirgan, 183 Cal. App. 3d 1318 (1986), to which Defendant cites, is distinguishable. In that case, an appellant shipping company alleged that former employees were soliciting customers from customer lists maintained by the

7

company, and that use of these lists constituted misuse of a trade secret. Id. at 1321. The court disagreed, finding that while a company's list of customers "may not be generally known to the public, they certainly would be known or readily ascertainable to other persons in the shipping business." Id. at 1326. The court noted that "the compilation process in this case is neither sophisticated nor difficult nor particularly time consuming," and that because "manufacturers will often deal with more than one company at a time," the appellant's competitors "have secured the same information that appellant claims and, in all likelihood, did so in the same manner as appellant." Id. In this case, by contrast, HSI has alleged – and provided evidence showing – that it created the information at issue through proprietary software, and that the misappropriated material includes extensive data beyond customer lists such as buying patterns and marketing and pricing strategies.

Cook also contends that customer order histories "do not constitute trade secrets or confidential information" because "[t]his information could readily be obtained from clients directly," and "the value of this information, if any, is simply one of convenience to the client, since pricing is already predetermined." Id. at 20. As already noted, HSI has alleged that the information taken by Cook is far more elaborate than simply a customer's order history. Even ignoring this point, however, it is not clear that the ability to obtain this information from individual clients demonstrates that the information is "generally known" or "readily ascertainable." Cook cites to Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal. App. 4th 853, 862-63 (1994), but that case is not applicable. In Metro Traffic, the alleged trade secret was the supposed "strict and particular requirements" of a radio station "regarding the quality, sound, and personality of the anchors reporting over its airways." Id. at 861. As the California court pointed out, "[t]hese are subjective dimensions of the employees who were found acceptable" by the radio station. Id. at 862. "No doubt Metro conveyed to its employees KFWB's preferences and requirements regarding word choice and factual reporting but that does not amount to the compilation of an intangible personal property right owned by the employer." Id. Here, HSI is not referring to subjective preferences regarding employees, but rather to established customer histories, and the patterns, preferences, and strategies that can be analyzed from that

8

data.

Cook also disputes HSI's portrayal of the information she e-mailed and downloaded, and her conduct in doing so. She argues that practice reports, for example, are designed only to "enable[] a doctor-client to compare his or her average fees earned per procedure with local competitors," and "is not used by HSI to improve its business." Id. at 11. For many of the e-mails, she states that the reason for sending them was not to gain any kind of advantage, but only to help her customers in various ways, such as in order to print out a copy for a client who "had specifically requested his Practice Report," to "assist a client and friend with the purchase of a dental practice," or to "enable Ms. Cook to answer any follow-up questions her client may have had." ECF No. 15 at 11-12. Other reports, she states, were sent to herself because she used them to estimate her monthly commission payments. Id. at 13. Because she did not intend to use them for personal gain, she argues that she did not "misappropriate" them under the terms of DTSA or CUTSA. Id. at 19-20.

Even if the Court were to credit Ms. Cook's testimony regarding her intentions, those intentions would be irrelevant to whether the documents and information she e-mailed to herself were trade secrets, or whether she misappropriated them. As noted in the Court's prior order, both DTSA and CUTSA define "misappropriation" as use of "improper means," which includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." See ECF No. 12 at 5. Here, it appears that Cook has at least obtained the alleged trade secrets through conduct that breached her confidentiality agreements with HSI.

It is clear that the parties differ on their assessments of the value of the information at issue. Having considered the declarations and statements offered by both sides, the Court concludes that Plaintiff has demonstrated a likelihood of success on the merits in regards to its trade secret claims. For the same reasons, the Court concludes that Plaintiff has demonstrated a likelihood of success in regards to its breach of contract claims that are dependent on allegations that Defendant breached her agreement to refrain from using or disclosing to others any confidential information, including trade secrets. See ECF No. 1 at 24.

## 2. Breach of Contract for Non-Solicitation

As to Plaintiff's claims that Defendant breached her agreement to refrain from soliciting any customers of HSI, Defendant's arguments are more persuasive. Cook argues that the non-solicitation agreements are void and unenforceable because they violate Cal. Bus. & Prof. Code section 16600, which states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

Based on this provision, California courts have invalidated "provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment or imposing a penalty if he does so." Muggill v. Reuben H. Donnelley Corp., 62 Cal. 2d 239, 242, (1965). In Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 947 (2008), the California Supreme Court clarified that this rule is not limited merely to total prohibitions. The Edwards court upheld the invalidation of two clauses. The first prohibited employees, "for an 18–month period, from performing professional services of the type he had provided while at Andersen, for any client on whose account he had worked during 18 months prior to his termination." Id. at 948. The second prohibited employees, "for a year after termination, from 'soliciting,' defined by the agreement as providing professional services to any client of Andersen's Los Angeles office." Id.

Similarly, the non-solicitation clause of the agreement in this case, as relevant here, prohibits Cook from "solicit[ing] the patronage of any past or then-current customer of the Company" for twelve months after leaving her employment. ECF No. 1 at 24 (2005 Contract); see also ECF No. 1 at 27 (2011 Contract, expanding on the same prohibition for twelve months after leaving employment). This clause appears to be the type of agreement invalidated by section 16600. See Gatan, Inc. v. Nion Company, No. 15-CV-1862-PJH, 2016 WL 1243477, at *3 (N.D. Cal. Mar. 30, 2016) (invalidating a clause under section 16600 preventing a reseller from marketing, selling or distributing any products similar to Gatan's products within one year after entering into a purchase agreement).

At oral argument, Plaintiff contended that the non-solicitation clause may nevertheless be enforced by virtue of a "trade secret" exception. It is true that some cases in the Ninth Circuit and

10

California courts have recognized a trade secret exception to section 16600. See Asset Mktg. Sys., Inc. v. Gagnon, 542 F.3d 748, 758 (9th Cir. 2008); Muggill v. Reuben H. Donnelley Corp., 62 Cal. 2d 239, 242 (1965). A party seeking to invoke this exception, however, must demonstrate that the non-competition agreement is "necessary" to protect the trade secrets at hand. Gagnon, 542 F.3d at 758. Here, that requirement does not appear to be met, because there are separate clauses in the same agreements that independently require Cook to refrain from revealing or otherwise misusing trade secrets. See Gatan, 2016 WL 1243477 at *3 (finding that because the "Agreement already contains a separate provision, entitled 'Use of Confidential Information,' which provides protection for Gatan's trade secrets," the "non-compete provision in the Agreement is not necessary to protect Gatan's trade secrets"). Furthermore, even though HSI has reviewed a substantial volume of the materials that Cook downloaded – and brought hard copies to the hearing on this motion – it has yet to tie those materials to any specific HSI customer, much less any HSI customer Cook contacted on behalf of Patterson. On the facts as they have been discovered and presented thus far, the Court finds that HSI has not shown necessity.

### 3.     **Alternative Justification for Enjoining Cook's Contact with Customers**

Plaintiff also contended at oral argument that, notwithstanding the non-solicitation agreement, an injunction preventing Defendant from interacting with HSI customers is nevertheless necessary to prevent continued misuse of its trade secrets. HSI argued that without this piece of the injunction, it cannot ensure that Defendant does not continue to use information obtained from HSI in conducting business with customers. In support of this claim, it provided the Court with citations to Ret. Grp. v. Galante, 176 Cal. App. 4th 1226, 1238 (2009) and Pyro Spectaculars N., Inc. v. Souza, 861 F. Supp. 2d 1079, 1094 (E.D. Cal. 2012).

In Galante, the California Court of Appeal addressed a challenge to a preliminary injunction that barred the defendant, TRG, from "directly or indirectly soliciting" any customers of Retirement Group, which was a competitor and former affiliate of TRG. The Galante court addressed the "tension between two competing strands of legal principles in California": on the one hand, the rejection of noncompetition clauses embodied by section 16600, and on the other hand, the need to prevent former employees from misappropriating a former employer's trade

11

secrets to unfairly compete with the former employer. Id. at 1233-1237. Its synthesis of these two principles was that while a court may not enjoin solicitation of business based on a *contractual* clause – which would violate section 16600 – it may do so based on *tortious* conduct – such as violation of the CUTSA or the UCL. Id. at 1238. Thus, "a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information* to solicit those customers." Id. at 1237 (emphasis in original).

Galante went on to hold that the challenged injunction on TRG's solicitation of customers was invalid because it was not "designed to have the limited effect of protecting against the misappropriation of TRG's trade secrets." Id. at 1239. Souza, the other case cited by Plaintiff, expanded on this aspect of Galante's holding. Souza involved a request for an injunction against a former employee of PSI, a fireworks production company, preventing him from using allegedly stolen customer databases to solicit PSI's customers. 861 F. Supp. 2d 1079, 1082-83. Souza recognized the limitations of the Galante case and also held that a general restriction of defendant "from doing business with any PSI customer he learned of through his employment at PSI" would be overbroad. Id. at 1096-97. It did impose, however, a "narrow, time-limited non-solicitation restriction" on the defendant, for six months, concluding that this was necessary to protect PSI's trade secrets given that defendant had already refused to obey court orders to return and produce all trade secret material. Id.

Richmond Techs., Inc. v. Aumtech Bus. Sols., No. 11-CV-02460-LHK, 2011 WL 2607158, at *1-3 (N.D. Cal. July 1, 2011) is also relevant. The plaintiff, which did business as ePayware, requested a TRO enjoining the defendant companies from initiating contact with ePayware customers, based on allegations that the defendants, after working alongside ePayware via contract, began directly offering and marketing their own services to ePayware's clients. The Richmond court concluded that enjoining defendants from initiating contact with ePayware clients was appropriate because it was "necessary to protect ePayware's trade secrets." Id. at 19. It noted that the information gathered by defendants and its employees while working with ePayware likely constituted trade secrets, and moreover that plaintiff "presented evidence suggesting that

12

Defendants may be making use of this trade secret information" in their contact with customers. Id. at 20. It pointed to allegations that defendants have specifically targeted ePayware customers and that they have taken steps to make it appear that they, rather than ePayware, were the servicers of ePayware's clients. Id.

With this case law in mind, the Court turns to HSI's requested relief. It concludes that HSI has not demonstrated that enjoining Cook's contact with HSI customers is necessary to protect its trade secrets. Unlike in Souza, Cook has not previously shown an unwillingness to obey court orders requiring compliance with trade secret law, and unlike in Richmond, HSI has not offered specific evidence that Cook was utilizing trade secret information to solicit customers. More broadly, HSI's supporting declaration does not offer evidence of trade secrets that were misappropriated with regards to any particular customer that Cook has contacted since her resignation. Of course, if Cook indeed misappropriated confidential information regarding HSI customers, and further solicited the business of those customers after leaving HSI, one could certainly infer that she has used that confidential information in the course of her solicitation. Discovery may reveal such facts. But in the absence of specific evidence, the Court is unable to make such a finding.

In sum, the Court concludes that Plaintiff has not demonstrated a likelihood of success in regards to its claims that Defendant breaches her non-solicitation agreement. Further, Plaintiff has not offered sufficient evidence to conclude that an injunction of Defendant's contact with customers is necessary to protect Plaintiff's trade secrets. The Court therefore concludes that Plaintiff has not met its burden of demonstrating a likelihood of success on the merits in regards to its request to enjoin Defendant from soliciting, contacting, or accepting business from clients who were assigned to her while she was employed at HSI. The Court will now turn to the remaining Winter factors to determine if this more limited injunction is warranted.

### B.  Likelihood of Irreparable Harm

To obtain preliminary relief, Plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22. The Court's prior order concluded that Plaintiff had demonstrated a likelihood of irreparable harm that would result from the loss of trade

secrets related to customer purchase patterns, histories, and preferences, as well as the loss of established customer relationships and goodwill. This is because such losses would be difficult to quantify in terms of economic value. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001); see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

Cook contends that these losses would not be irreparable because they could be remedied via monetary damages for any lost transactions. ECF No. 15 at 22. HSI is not contending, however, that it will merely lose potential transactions. Rather, it is contending that it may lose customer *relationships*, which could generate an unknown number of future sales. Indeed, Cook argues that the same losses of customer relationships and goodwill would irreparably harm her if she were enjoined from interacting with her clients. See ECF No. 15 at 23.

Cook also argues that Plaintiff has not demonstrated any harm because the alleged trade secrets are in fact widely available. She states that "HSI does not explain why its client lists, publicly-available inventory numbers and pricing information would likely result in a loss of business, particularly in an industry where: (1) dental supply companies' clients are widely known among sales representatives within the industry, (2) the identity of dental practices is publicly available, (3) the vast majority of dental practices order from more than one dental supply company simultaneously, and (4) HSI shares the allegedly 'secret' information with its customers with no confidentiality protections whatsoever." ECF No. 15 at 22. As stated above, however, HSI claims discuss far more than client lists and publicly available inventory numbers and pricing information.

Finally, Cook notes that HSI did not move for equitable relief until nearly a month after the alleged misconduct, and also notes, as this Court's prior order did, that HSI does not specify when it discovered the misconduct. ECF No. 15 at 22. While delay in obtaining relief can suggest the absence of potential irreparable harm, HSI explained at oral argument that it took some time for HSI to complete its investigation of Cook's computer and workspace upon her resignation, and additional time to ensure its legal claims in support of injunctive relief were sufficient. The Court

is satisfied that the one-month delay here should weigh little in the Court's analysis.

Accordingly, the Court concludes HSI has demonstrated a likelihood of irreparable harm.

### C.  Public Interest

When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be "at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." Bernhardt v. L.A. County, 339 F.3d 920, 931 (9th Cir. 2003).  If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.  See Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002) ("In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff.").

Here, the injunction is limited only to the Defendant's conduct.  Moreover, the Court's prior order held that the public interest is served by enabling the protection of trade secrets.  See ECF No. 12 at 6 (citing Bank of Am., N.A. v. Lee, No. CV 08-5546 CAS(JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)).

Cook argues that the requested injunction is contrary to the public interest because it would prevent lawful competition, namely by "prevent[ing] Ms. Cook from servicing customers with whom she worked even before her employment at HSI." ECF No. 15 at 24.  As noted above, however, the Court will not enjoin Cook from contacting or doing business with customers.  Cook offers no argument as to why an injunction preventing her only from accessing, revealing, or misusing alleged trade secrets would be contrary to the public interest.  The Court concludes this requirement has been met.

### D.  Balance of the Equities

In considering the equities of a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24.

Plaintiff has contended that it "has suffered and will continue to suffer irreparable harm if Cook is allowed to continue to try to divert its customers using HSI's own confidential,

proprietary, and trade secret documents and information." ECF No. 2-1 at 24. This loss constitutes a hardship that tips the balance in favor of Plaintiff. See Nike, Inc. v. McCarthy, 379 F.3d 576, 587 (9th Cir. 2004) (holding that Nike demonstrated harm from "unfair competition due to McCarthy's knowledge of confidential information" specific to Nike). Cook, on the other hand, is asked only to refrain from misusing protected trade secrets and violating her confidentiality agreements with HSI. See Dish Network L.L.C. v. Ramirez, No. 15-CV-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state . . . laws" (citation omitted)); see also Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 830 (9th Cir. 1997) (finding that "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration") (citation and quotation marks omitted)).

In response, Cook argues that the injunction would disproportionately harm her because, given the character of the industry, "sales representatives, which are generally compensated strictly by commission, work hard to develop longstanding client relationships over the course of their careers." ECF No. 15 at 23. She states that an injunction preventing her from communicating with clients jeopardizes her entire career, and that the TRO has already prevented her from responding to inquiries from at least twenty clients. Id. at 24. As noted above, the Court will not enjoin Cook from contracting or doing business with her clients. Therefore, this argument does not suggest the equities tip in her favor.

Cook further argues that the requested injunction interferes with her due process rights by preventing her and her attorneys from speaking with witnesses or from reviewing the alleged trade secrets that Cook has been accused of misappropriating. ECF No. 15 at 25. As the Court noted at the motion hearing, it would be improper for an injunction to prevent Cook or her attorneys from obtaining the needed material to litigate this case. To address these concerns, the Court sua sponte issued the Northern District's Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets, with minor modifications as noted in the minutes. ECF No. 17. This appeared to satisfy the parties' concerns, and accordingly, the Court

1  concludes this argument does not demonstrate that the injunction would impose disproportionate

2  hardships upon Cook.

## CONCLUSION

4  The Court will grant in part and deny in part the motion for a preliminary injunction.

5  Accordingly, it orders as follows:

6  The TRO imposed by this Court in its June 10, 2016 order, ECF No. 12, shall remain in

7  effect until further order of this Court, with the exception of section 5, which prohibits Defendant,

8  and all those acting in concert or participation with her, from "soliciting, continuing to solicit,

9  initiating contact with, or accepting business from, any HSI customers whose accounts were

10 assigned to her while she was employed by HSI." Section 5 of the TRO is no longer in effect as

11 of the issuance of this order.

12 For clarity, the sections of the preliminary injunction are reproduced here:

13 1.    Pursuant to Federal Rule of Civil Procedure 26(d)(1), Defendant shall immediately

14 preserve all documents, data, tangible things, and other materials relating to this case, including,

15 without limitation, emails, data, data bases, cloud storage, and paper and electronic data and

16 documents, including any and all metadata, and shall take all steps necessary to do so.

17 2.    Defendant, and all those acting in concert or participation with her, are hereby

18 enjoined from altering, destroying, or disposing of any evidence or other materials, in any form,

19 relating to this action and the issues raised herein, including, without limitation, all devices,

20 electronic media, cloud storage, and all copies of any and all documents, media and/or other

21 materials, containing, identifying, describing, reflecting or referencing HSI's confidential,

22 proprietary, or trade secret information, and any and all documents, data and information which

23 was obtained by Cook from, or by virtue of her employment with, HSI, including all current or

24 archived media, emails, chats, texts, documents, electronic logs, metadata, storage and directories

25 3.    Defendant, and all those acting in concert or participation with her, are hereby

26 enjoined from directly or indirectly accessing, using, disclosing, or making available to any person

27 or entity other than Plaintiff, any of HSI's confidential, proprietary, or trade secret documents,

28 data or information.

1    4. Defendant, and all those acting in concert or participation with her, are hereby
2 enjoined from directly or indirectly violating or interfering with the confidentiality obligations of
3 her agreements with HSI.
4    IT IS SO ORDERED.
5 Dated:  June 22, 2016



JON S. TIGAR
United States District Judge